IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

HSA COMMERCIAL, INC. d/b/a
HSA COMMERCIAL REAL ESTATE,
an Illinois corporation,

       Plaintiff,                Case No. 08-CV-1805

vs.

STEVEN STEWART AND NEW VISION
DEVELOPMENT CO., LLC a Wisconsin
limited liability company,

       Defendants.

**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR IMPROPER VENUE PURSUANT TO FRCP 12(b)(3); ALTERNATIVELY, DEFENDANT'S MOTION TO TRANSFER TO THE EASTERN DISTRICT OF WISCONSIN PURSUANT TO 28 U.S.C. § 1404(a)**

**PLEASE TAKE NOTICE**, that the Defendants, Steven Stewart and New Vision Development Co., LLC, by their counsel, THE MACK LAW GROUP, PC, do hereby move the Court pursuant to Rule 12(b)(3) of the Rules of Civil Procedure for a dismissal of the Plaintiff's Complaint. The basis of this motion is that (1) this action was filed under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and (c); (2) pursuant to 28 U.S.C. § 1391(a), venue is not proper in the Northern District of Illinois; (3) all Defendants reside in the State of Wisconsin; and (4) there were no substantial events or omissions giving rise to the Plaintiff's claims conducted by the Defendants while the Defendants were located in the Northern District of Illinois, nor is the property that is the subject of this action located in the Northern district of Illinois.

Alternatively, should this Court find that venue is proper in the Northern District of Illinois, the Defendants hereby move this Court pursuant to 28 U.S.C. § 1404(a) for a transfer of

this matter to the Eastern District of Wisconsin. The basis for this motion is that: (1) the Eastern District of Wisconsin is a proper venue for this action; (2) the transfer of this matter to the Eastern District of Wisconsin will serve the convenience of the parties and witnesses to this action; and (3) the transfer of this matter to the Eastern District of Wisconsin will serve the interests of justice.

In support of these Motions, the Defendants submit the attached Brief in Support of Motion to Dismiss for Improper Venue Pursuant to Federal Rule of Civil Procedure 12(b)(3); or in the alternative, To Transfer Venue Pursuant to 28 U.S.C. § 1404(a), and an Affidavit of Steven Stewart.

Dated this 28th day of April, 2008.

Respectfully Submitted,
By: s/ Brian P. Mack
ARDC 6255657
bmack@macklawyers.com

The Mack Law Group, PC
20 S. Clark, Suite 500
Chicago, Illinois 60603
PH: (312) 676-0100
FAX: (312) 372-7076

## Certificate of Service

I hereby certify that on April 28, 2008, a copy of foregoing DEFENDANT'S MOTION TO DISMISS was filed electronically. Notice of this filing will be sent by operation of the Court's Electronic Filing System to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

s/ James Tragos
The Mack Law Group, PC
20 S. Clark Suite 500
Chicago, IL 60603
Phone: 312-676-0100
Fax: 312-372-7076
jtragos@macklawyers.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

---

HSA COMMERCIAL, INC. d/b/a
HSA COMMERCIAL REAL ESTATE,
an Illinois corporation,
      Plaintiff,

Case No. 08-CV-1805

vs.

STEVEN STEWART AND NEW VISION
DEVELOPMENT CO., LLC a Wisconsin
limited liability company,
      Defendants.

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR IMPROPER VENUE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(3); OR, IN THE ALTERNATIVE, TO TRANSFER VENUE PURSUANT TO 28 U.S.C. §1404(a)

---

### I.    INTRODUCTION

The Plaintiff, HSA Commercial, Inc. d/b/a HSA Commercial Real Estate ("HSA"), is an Illinois corporation with its principal place of business in Chicago, Illinois.  HSA has brought this action against the Defendants, Steven Stewart ("Stewart") and New Vision Development Company, LLC ("New Vision") for Injunction, Fraud, Breach of Fiduciary Duty, and Unjust Enrichment. Stewart is an adult resident of the State of Wisconsin. New Vision is a Wisconsin limited liability company with its principal place of business located in Milwaukee, Wisconsin. HSA has filed this action in United States District Court, Northern District of Illinois, asserting that this Court has personal jurisdiction over the Defendants under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and (c).  Since jurisdiction is based solely on diversity, venue is determined pursuant to 28 U.S.C. § 1391(a).  Venue is not proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a), and accordingly, this case must be dismissed. Alternatively, if this Court finds that the Northern District of Illinois is a proper venue for this action, the Defendants request that this matter be transferred to the Eastern District for the State of Wisconsin pursuant to 28 U.S.C. §1404(a).

### II.    FACTS RELEVANT TO MOTION

The Defendant, Stewart, is a licensed Wisconsin real estate broker and is in the business of locating, brokering, and providing commercial and residential real estate services in the State of Wisconsin. (See Affd. of Stewart ¶1)  Additionally, Mr. Stewart is the sole member of New

Vision, which has been in existence since May 17, 2006 and is in the business of developing real estate in Southeastern Wisconsin. (See Affd. of Stewart ¶¶ 2, 3)  In approximately 2005, Mr. Stewart became aware of the opportunity to purchase property located in the City of Milwaukee at the corner of 6th Street and State Street (the "Site"), which was owned by Milwaukee County. (See Affd. of Stewart ¶4)  The Site is approximately 1.9 acres, and zoned Central Business District: Civil Activity C9D(A), allowing for Office, Retail, Hotel and Residential uses. (See Complaint ¶6) (See Ex. B to Affd. of Stewart)  Mr. Stewart became aware of this opportunity through Mr. John Bowles. (See Affd. of Stewart ¶4)  When Mr. Bowles approached Mr. Stewart regarding this property, Mr. Bowles had already developed a preliminary plan, had identified some potential tenants for a mixed use development at the Site, and had already submitted his proposal to the County in an attempt to obtain the rights to purchase the Site.  *Id.*  Mr. Bowles was unsuccessful in his attempt to obtain the rights to purchase the Site in 2002; however, Mr. Bowles still felt that the County was receptive to his ideas for the development of the Site.

In approximately 2005, Mr. Stewart became actively involved in creating a plan for the development of the Site. (See Affd. of Stewart ¶5)  Mr. Stewart's plan also called for a mixed use development plan, including the development of a parking lot, retail shops, and a resource building for neighboring Milwaukee Area Technical College ("MATC").  *Id.*  Mr. Stewart's efforts in developing the proposed development of the Site included contacts and meetings with several Milwaukee area companies, including Voss Jorgenson Shuler and CG Schmidt Construction, to determine the level of interest they might have in constructing and/or financing the development the Site; however, no agreements were ever reached.  *Id.*

On or about Summer/Fall 2007, Mr. Stewart received a Request for Proposal ("RFP") from Milwaukee County, informing anybody interested in purchasing the Site to submit plans and information regarding their proposed development. (See Affd. of Stewart ¶6)  Milwaukee County required all proposals to be submitted by September 6, 2007.  *Id.*

Prior to receiving the RFP from the County, Mr. Stewart met Mr. Eric Ogden, a Vice President of HSA, at a jobsite in Milwaukee. (See Affd. of Stewart ¶7)  Mr. Stewart learned from Mr. Ogden that HSA was in the business of providing financing for real estate projects in the Milwaukee area, and that HSA also maintained an office in Brown Deer, Wisconsin.  *Id.*

Subsequent to Stewart's meeting with Mr. Ogden, Stewart met HSA representatives John Mangel and Dan Miranda at a potential jobsite in Milwaukee, Wisconsin, located at the corner of State Street and Van Buren. George Schmidt from CG Schmidt was also present at this meeting, which involved the potential for building condominiums at State and Van Buren. The parties

2

also discussed the development pan of the Site at 6th and State that New Vision was putting together. In fact, the parties traveled to the Site that same day. Based upon HSA's expressed interest in the Site, the parties arranged for Mr. Stewart to travel to HSA's Chicago office to discuss the proposed development. (See Affd. of Stewart ¶¶ 8-11)

On or about July 27, 2007, as arranged for during the face-to-face meeting in Milwaukee, Mr. Stewart traveled to HSA's Chicago office to discuss the proposal New Vision was developing for the Site in Milwaukee County. (See Affd. of Stewart ¶11) This meeting was also attended by John Bowles, Rob Weich and Alec Carter, who were all involved in the development team New Vision was putting together. *Id.* Mr. Weich and Mr. Carter are both Wisconsin real estate brokers, assisting New Vision in the location of potential tenants for the development of the Site. *Id.* The July 27, 2007 meeting at HSA's office in Chicago covered the following: The basic development plan that New Vision was working on; that New Vision was in the process of building a team for the development of the Site; that New Vision was the lead development firm for this Site; that New Vision had already begun to utilize Mr. Bowles as the Project/Development Manager; that New Vision was already utilizing the services of Mr. Carter and Mr. Weich in brokering potential leases on the Site; and that New Vision inquired whether HSA would be interested in becoming a part of the team being put together. Additionally, New Vision informed HSA that HSA's role on the team would primarily be through financing; however, since HSA has been involved in numerous real estate transactions throughout the country, any ideas that HSA might have for the development of the Site were welcome. (See Affd. of Stewart ¶11)

Subsequent to the July 27, 2007 meeting, HSA representatives traveled to Milwaukee on at least five occasions to inspect the Site and discuss the scope of the development by New Vision. (See Affd. of Stewart ¶12) At these meetings, Stewart informed HSA that the main need that New Vision had for HSA was to provide financing. *Id.* Additionally, HSA had an established relationship with CPS, a major parking structure operator. *Id.* Since the development plans and proposal that New Vision was putting together to submit to the County were for mixed use development including a parking structure, New Vision was aware that any relationship that it established with HSA would help in obtaining an agreement with CPS in the future. *Id.*

After the numerous trips that HSA made to Milwaukee to inspect the Site, HSA informed New Vision that they desired to work with New Vision on the development of the Site. (See Affd. of Stewart ¶13) Based upon HSA's expressed desire to work with New Vision on the

3

potential development, the parties began discussions on both the development, as well as the details of an agreement between the parties. *Id.*

On or about September 6, 2007, New Vision submitted a Proposed Development Plan to Milwaukee County for the option to purchase and develop the Site. (See Affd. of Stewart ¶14; See Ex. A to Affd. of Stewart) The Proposed Development Plan lists New Vision as the potential owner of the Site, and lists entities New Vision would be working with in the development. *Id.* Based upon the conversations that Mr. Stewart had with HSA, New Vision's Proposed Development Plan listed HSA; despite the lack of an agreement between the parties. *Id.*

At the time New Vision submitted its Proposed Development Plan to the County, all discussions between the parties were still preliminary, and no agreements had been reached outlining their relationship. (See Affd. of Stewart ¶15) Even with no agreement, the parties still proceeded to work together on securing the approval of the Proposed Development Plan that was submitted by New Vision. Specifically, from the time New Vision submitted its Proposed Development Plan to the County on September 6, 2007, through the date New Vision was awarded the option to purchase the site, HSA representatives traveled to Milwaukee numerous times to participate in the following:

(1)    November 17, 2007 - meeting with the President of MATC at MATC's offices located in Milwaukee. This meeting was also attended by Mr. Stewart and Mr. Bowles. The purpose of the meeting was to discuss MATC's interest in leasing property at the Site.

(2)    January 29, 2008 – HSA representatives traveled to Milwaukee for a presentation to the Economic Development Committee of Milwaukee County. This presentation was made by Mr. Stewart, along with Mr. Bowles, and occurred at Milwaukee County's offices located in Milwaukee. The presentation was specifically regarding the Proposed Development Plan that New Vision had submitted on September 6, 2007.

(3)    HSA traveled to Milwaukee for approximately six meetings with MATC.

(4)    February 7, 2008 – HSA and Mr. Bowles attended a Milwaukee County Supervisor's meeting in Milwaukee regarding the status of the project.

(See Affd. of Stewart ¶16)

Throughout this time period, while the parties were all working on the project, New Vision exchanged various offers and counter-offers with HSA to specifically define the relationship between them, including various manners in which both parties would be compensated for their role in the project. (See Affd. of Stewart ¶17) However, no agreement has ever been reached between the parties, and actions taken by HSA made it clear that the parties would not be able to reach an agreement. (See Affd. of Stewart ¶17)

4

On March 28, 2008, the Plaintiff filed an eighteen page complaint against the Defendants, containing fifty-three paragraphs, alleging four causes of action. (See Complaint) While the Plaintiff's Complaint lists numerous "facts" that allegedly cause the basis for their causes of action, there are only two specific instances in which the Plaintiff's allege that either Mr. Stewart and/or New Vision ever conducted any activity in the Northern District of Illinois. They are:

(1)     In July of 2007, Stewart contacted HSA in Chicago to present the opportunity of potential acquisition and development of the Site; and (See Complaint ¶8)

(2)     These roles [alleged roles of each party] were agreed to before, and at a meeting at HSA's office in Chicago, on October 4, 2007 attended by Stewart and Bowles. (See Complaint ¶12)

Further, the Plaintiff's Complaint alleges that the only correspondence that Stewart and/or New Vision provided to HSA's Chicago office was initial information about the Site in August 2007 (subsequent to the initial meeting), (See Complaint ¶9), and various proposals for compensation. (See Complaint ¶¶ 25, 30, 31, 33) While the Plaintiff's Complaint lacks specific allegations of actual conduct engaged in by the Defendants that occurred in the Northern District of Illinois that form the basis for the Plaintiff's causes of action, the Complaint does make specific reference to the numerous trips and contacts that the Plaintiff engaged in the City and County of Milwaukee [Eastern District, State of Wisconsin]. (See Complaint ¶¶ 14, 15, 17, 18, 19, 24, 26, 27, 28, 29, 32) Further, there is no dispute that the property that is the subject of this action is located in the City and County of Milwaukee, at the corner of 6th and State, in the Eastern District of Wisconsin.

## III.     THE PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(3) SINCE IT WAS FILED IN AN IMPROPER VENUE

The Plaintiff filed its Complaint alleging that this Court possesses diversity jurisdiction over the Defendants pursuant to 28 U.S.C. § 1332(a) and (c). While this Court possesses specific jurisdiction over the Defendants, this Court is not a proper venue in which this action can be brought. Pursuant to Federal Rule of Civil Procedure 12(b)(3), the Defendants request that this Court dismiss the Plaintiff's Complaint.

### A. LAW

Federal Rule of Civil Procedure 12(b) provides that "Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: ... (3) improper venue." *See* FRCP 12(b)(3). "A

motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed." *See* FRCP 12.

For purposes of a motion to dismiss for improper venue, the court must take all allegations in the complaint as true unless contradicted by the defendants' affidavits. *Interlease Aviation Investors v. Vanguard Airlines, Inc.*, 262 F.Supp.2d 898, 913 (N.D.Ill. 2003). However, if there are disputed facts, "[t]he court must resolve all factual [disputes] and draw all reasonable inferences in the plaintiff's favor." *Id.*; *Saylor v. Dyniewski*, 836 F.2d 341, 342 (7th Cir. 1988). Once a defendant has sought dismissal on the basis of improper venue, the plaintiff bears the burden of proving that venue is proper. *Interlease*, 262 F.Supp2d at 913.

Where jurisdiction in an action is based solely on diversity, venue is determined in accordance with the requirements of 28 U.S.C. § 1391(a), which provides:

> (a) civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is subject to the action is situated; or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced if there is no district in which the action may otherwise be brought.

*See* 28 U.S.C. § 1391(a).

In order for venue to be proper in the Northern District of Illinois under § 1391(a)(1), all defendants must reside in the State of Illinois, with at least one of the defendants residing in the Northern District of Illinois. For venue to be proper in this District pursuant to § 1391(a)(2), the Plaintiff must establish that a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois, or that a substantial part of the property that is the subject of the action is located in the Northern District of Illinois. Finally, if venue cannot be established in *any* district pursuant to § 1391(a)(1) or (2), then, pursuant to § 1391(a)(3), venue can be found in any judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced. However, § 1391(a)(3) is *inapplicable* if there is another district in which the action could have been brought. Additionally, venue may be proper in multiple districts. *Estate of Moore v. Dixon*, 460 F.Supp.2d 931, 935 (E.D.Wis. 2006) (citation omitted).

In analyzing § 1391(a)(2), "The test for determining whether a 'substantial part' of the events or omissions giving rise to a claim occurred in a particular district is more of a qualitative,

rather than a quantitative inquiry." *Moore*, 460 F.Supp.2d at 936; *citing Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432-33 (2d Cir. 2005). The "substantiality of the events which occurred in a particular district is determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum district, not by simply adding up the number of contacts." *Id*. "When determining whether a substantial part of the events giving rise to the claim occurred in a particular district, **the court must focus on the activities of the defendant[s], not those of the plaintiff.**" *Moore*, 460 F.Supp.2d at 936; citing *PKWare, Inc. v. Meade*, 79 F.Supp.2d 1007, 1015 (E.D.Wis. 2000). Further, "in order for the events to be deemed 'substantial' under the statute, they must have a 'close nexus' to the alleged claim." *Moore*, 460 F.Supp.2d at 936 (citation omitted).

## B. VENUE IS NOT PROPER IN THE NORTHERN DISTRICT OF ILLINOIS

Pursuant to 28 U.S.C. § 1391(a), venue is not proper in the Northern District of Illinois. Accordingly, pursuant to FRCP 12(b)(3), this Court must dismiss the Plaintiff's Complaint.

The Plaintiff has brought this case under diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a) and (c), of which venue must be found in 28 U.S.C. § 1391(a). It is undisputed that the Defendants, Stewart and New Vision, reside in the State of Wisconsin, in the Eastern District of the State of Wisconsin. Thus, venue is proper in the Eastern District of Wisconsin pursuant to § 1391(a)(1). Additionally, since it is undisputed that venue is proper in the Eastern District of Wisconsin, venue cannot be established in the Northern District of Illinois pursuant to §1391(a)(3), as that section applies *only* if there is "no district in which the action may otherwise be brought." *See* 28 U.S.C. § 1391(a)(3). Therefore, the sole manner in which the Northern District of Illinois can be held as a proper venue for this action is pursuant to § 1391(a)(2); requiring that a substantial part of the events or omissions giving rise to the claim occurred in this district, or a substantial part of the property that is the subject of the action is situated in the district. Since the Defendants did not commit a substantial part of the acts or omissions that give rise to the Plaintiff's claims while in the Northern District of Illinois, nor is the property that is subject of this action located in the Northern District of Illinois, venue is not proper in this District.

**1.    The Defendants Did Not Commit a Substantial Part of the Events or Omissions Giving Rise to the Plaintiff's Claims While the Defendants Were in the Northern District of Illinois.**

The Plaintiff has failed to provide this Court with allegations that a substantial part of the events or omissions allegedly committed by the Defendants occurred while the Defendants were

located within the Northern District of Illinois. Pursuant to § 1391(a)(2), venue is not proper in this District; and accordingly, this case must be dismissed.

"When determining whether a substantial part of the events giving rise to the claim occurred in a particular district, the court **must focus on the activities of the defendant, not those of the plaintiff.**" *Moore*, 460 F.Supp.2d at 936; citing *PKWare, Inc. v. Meade*, 79 F.Supp.2d 1007, 1015 (E.D.Wis. 2000) (emphasis added). Here, the Plaintiff has asserted that the Defendants were only in the Northern District of Illinois on two occasions: July 27, 2007 and October 4, 2007. (See Complaint ¶¶ 8, 12) While the defendants do not dispute this fact, the activities that occurred on those two occasions are not a substantial part of the events giving rise to the Plaintiff's four causes of action. Rather, the alleged substantial acts by the Defendants that give rise to the Plaintiff's causes of action all occurred in the State of Wisconsin. Specifically, the Plaintiff has alleged that the Defendants have committed fraud, breach of fiduciary duty, and unjust enrichment, based upon the allegations that the Defendants submitted "altered materials" to Milwaukee County, in which the Defendants "represented that New Vision was the lead member of the development team and that New Vision with HSA would secure equity and financing for the project..." (See Complaint ¶23) It is this alleged "alteration" and "false representation" by the Defendants that is the basis for all of the Plaintiff's claims in this action. Since this alleged act by the Defendants occurred not within the Northern District of Illinois, but rather, in the State of Wisconsin, venue is not proper in this District.

**2.    There is Not a Substantial Part of the Property that is the Subject of this Action Located Within the Northern District of Illinois.**

Since the property that is the subject of this action is located in the State of Wisconsin, venue is not proper in this District. Pursuant to FRCP 12(b)(3) and 28 U.S.C. § 1391(a), the Plaintiff's Complaint must be dismissed. The Plaintiff is seeking and injunction, enjoining the Defendants from proceeding with the development of the property located at Sixth and State Street in Milwaukee, Wisconsin. (See Complaint, Count I, p. 14) Thus, it is undisputed that this property, which is the subject of the action, is not located within this district. Pursuant to § 1391(a)(2), venue is not proper in this District.

**IV.    ALTERNATIVELY, SHOULD THIS COURT HOLD THAT VENUE IS PROPER IN THIS DISTRICT, THIS ACTION SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF WISCONSIN PURSUANT TO 28 U.S.C. § 1404(a)**

**A.  LAW**

A motion that is brought under 28 U.S.C. § 1404(a) presupposes that venue is proper in the venue in which the action is pending, but nonetheless, seeks to transfer the venue to a different district that is more suited to the convenience of the witnesses and the needs of justice. Section 1404(a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

*See* 28 U.S.C. § 1404(a)

"A transfer under § 1404(a) is appropriate if: (1) venue is proper in both the transferor and the transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interests of justice." *Truserv Corp. v. Neff*, 6 F.Supp.2d 790, 793 (N.D.Ill. 1998); citing *Vandeveld v. Christoph*, 877 F.Supp. 1160, 1167 (N.D.Ill. 1995). "The weight to be accorded each of the factors is left to the sound discretion of the court." *Truserv*, 6 F.Supp.2d at 793; *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986).

When a § 1404(a) motion is brought, the defendant has the burden of showing that "the transferee forum is clearly more convenient." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 833 F.2d 1286, 1293 (7th Cir. 1989). "In evaluating a request for transfer under § 1404(a), the court must consider both the private interests of the parties and the public interests of the court." *Truserv*, 6 F.Supp.2d at 793; *Medi USA, L.P. v. Jobst Inst., Inc.*, 791 F.Supp. 208, 210 (N.D.Ill. 1992).

> Private factors include: (1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof in each forum including the courts' power to compel the appearance of unwilling witnesses and the costs of obtaining the attendance of witnesses; and (4) convenience of the parties, their residences and their abilities to bear the expense of trial in a particular forum. Public interest factors include: (1) the relation of the community to the issue of the litigation and desirability of resolving controversies in their locale; (2) the court's familiarity with applicable law; and (3) the congestion of the respective court dockets and the prospects for earlier trial.

*Truserv*, 6 F.Supp.2d 790 (citations omitted).

When balancing the private factors, a plaintiff's choice of forum is entitled to substantial weight under § 1404(a), particularly where it is also the plaintiff's home forum. *Gallery House, Inc. v. Yi*, 587 F.Supp. 1036, 1040 (N.D.Ill. 1984) (citation omitted). However, when "the

conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum, the plaintiff's preference has minimal value." *Dunn v. Soo Line R.R. Co.*, 864 F.Supp 64, 65 (N.D.Ill. 1994).

Further, courts often view "the most important factor in the transfer balance" as the appearance of witnesses. *Rose v. Franchetti*, 713 F.Supp. 1203, 1214 (N.D.Ill. 1989). "The party seeking the transfer must clearly specify the key witnesses to be called and make a general statement of their testimony." *Heller*, 883 F.2d at 1293 (citations omitted). However, this determination should not turn on which party produces a longer witness list. *Chemical Waste Management, Inc. v. Sims*, 870 F.Supp. 870, 876 (N.D.Ill. 1994). Rather, the court must look to the nature and the quality of the witnesses' testimony with respect to the issues of the case. *Vandeveld*, 877 F.Supp. at 1168; *See also Aquatic Amusement Associates, Ltd. V. Walt Disney World Co.*, 734 F.Supp. 54, 57 (N.D.N.Y. 1990).

The public factors that the court is to consider are also termed as the "interests of justice." These factors focus on the "efficient administration of the court system, rather than the private considerations of the litigants." *Espino v. Top Draw Freight System, Inc.*, 713 F.Supp. 1243, 1245 (N.D.Ill. 1989) (citations omitted).

## B. TRANSFER TO THE EASTERN DISTRICT OF WISCONSIN IS APPROPRIATE PURSUANT TO § 1404(a)

Transfer of this matter to the Eastern District of Wisconsin is appropriate, as venue is proper in that district, the transfer will serve to the convenience of the parties, the convenience of the witnesses, and the interests of justice. Thus, pursuant to 28 U.S.C. § 1404(a), this Court should transfer this action to the Eastern District of Wisconsin.

### 1. Venue is Proper in the Eastern District of Wisconsin.

This matter has been brought pursuant to 28 U.S.C. § 1332(a) and (c) under diversity jurisdiction. In determining the proper venue for a case brought under diversity jurisdiction, 28 U.S.C. § 1391(a) is controlling. Section 1391(a)(1) provides that venue is proper in "a judicial district where any defendant resides if all defendants reside in the same State." It is undisputed that both Defendants reside in the State of Wisconsin and that both Defendants reside in the Eastern District of Wisconsin. Accordingly, pursuant to § 1391(a)(1), venue is proper in that district.

Further, the Plaintiff is seeking an injunction both preliminary and permanently enjoining the Defendants from proceeding with a mixed use residential development located at Sixth and State

10

Street in Milwaukee, Wisconsin. Pursuant to § 1391(a)(2), a substantial part of the property that is the subject of the action is located in the Eastern District of Wisconsin. Therefore, venue is appropriate in this matter pursuant to § 1391(a)(1) and (2).

### 2. The Transfer of this matter to the Eastern District of Wisconsin will serve the convenience of the parties and the convenience of the witnesses.

"The moving party [here the Defendants] bears the burden of showing that 'the transferee forum is clearly more convenient' than the transferor forum." *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d at 1293 (citation omitted). The factors for the court to consider are the plaintiff's choice of forum, the convenience of the parties, the convenience of the witnesses, and the location of relevant documents and sources of proof. *FUL Inc. v. Unified School District No. 204*, 839 F.Supp. 1307, 1311 (N.D.Ill. 1993) (citations omitted). Transfer will be deemed inappropriate if it "merely transforms an inconvenience for one party into an inconvenience for the other party." *Sage Products, Inc. v. Devon Industries, Inc.*, 148 F.R.D. 213, 216 (N.D.Ill. 1993) (citations omitted). In the present case, the Eastern District of Wisconsin is a clearly more convenient forum for this action than the Northern district of Illinois, and accordingly, this court should transfer the matter pursuant to 28 U.S.C. § 1404(a).

### a. The Plaintiff's Choice of Forum is of Minimal Value

Since the alleged conduct and events giving rise to the Plaintiff's cause of action did not take place in the Northern District of Illinois, the Plaintiff's preference of the Northern District of Illinois for this matter has minimal value. *Dunn v. Soo Line R.R. Co.*, 864 F.Supp 64, 65 (N.D.Ill. 1994). Thus, while the Plaintiff's choice of forum is usually entitled to substantial weight in a § 1404(a) analysis, in the present case, the Plaintiff's choice is minimal. As depicted by the Plaintiff's Complaint, as well as the Affidavit of Mr. Stewart, the entirety of the events (minus two meetings) that took place in this dispute occurred in the State of Wisconsin, not the Plaintiff's selected forum. Thus, there is no balance leaning strongly in the Plaintiff's favor based upon the fact that this is the Plaintiff's home forum.

### b. All Material Events in this Dispute Occurred in the State of Wisconsin

As stated previously and alleged by the Plaintiff in its Complaint, the Defendants conducted activities in the State of Illinois on only two occasions. However, the Plaintiff and the Defendants conducted numerous activities that are material to this dispute in the State of Wisconsin, particularly, in Milwaukee. These material events included numerous meetings at the Site, numerous meetings with representatives of MATC, meetings and presentations with the

Milwaukee County Board, meetings with several Wisconsin real estate brokers, meetings with potential tenants for the proposed mixed use development, and hiring a Wisconsin engineering company to provide engineering services for the Site. In addition to the numerous meetings that occurred in the State of Wisconsin, the basis of the Plaintiff's Complaint revolves around a proposal that was submitted by the Defendants to the City and County of Milwaukee. Thus, all material events that have given rise to the Plaintiff's causes of action occurred in the State of Wisconsin. Accordingly, this matter should be transferred to that District.

### c. The Defendants Do Not Have Relative Ease To Access to Sources of Proof if This Case is Heard in the Northern District of Illinois; Namely, the Defendants Will be Hindered by this Court's Inability to Compel the Appearance of Unwilling Witnesses and Will Incur Substantial Costs in Obtaining the Attendance of Witnesses

This factor is widely considered "the most important factor in the transfer of balance." *Rose v. Franchetti*, 713 F.Supp. 1203, 1214 (N.D.Ill. 1989). The party seeking transfer must clearly specify the key witnesses to be called and make a general statement of their testimony. *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d at 1293 (citations omitted). Consideration of the parties' respective residences and their abilities to bear the expense of trial in a particular forum, as well as the ability of each party to subpoena documents, subpoena witnesses, and secure witnesses attendance at trial are all factors for the court to consider. (Cite)

In the present case, there are a large number of witnesses who possess knowledge and will provide testimony in this matter. This includes both the named parties themselves, as well as numerous non-party witnesses, with the majority of the non-party witnesses residing in the State of Wisconsin. Currently, without conducting any formal discovery, the Defendants estimate that it will be necessary to elicit the testimony of at least 18 non-party witnesses that reside in the State of Wisconsin. (See Estimated Witness List attached) The witnesses include Wisconsin real estate brokers involved in the disputed project, Wisconsin engineers involved in the disputed project, members of MATC who met with both the Plaintiff and Defendants with regard to the project, officials and employees of both the City and County of Milwaukee, including the Milwaukee County Board Members who reviewed New Vision's Proposed Development Plan and ultimately awarded the option to the Defendant, several additional Milwaukee construction firms that were consulted regarding the development of the Site, and other individuals that were present at the numerous meetings between the parties that occurred in Milwaukee. *Id.*

In addition to the large number of key witnesses that are located in the State of Wisconsin, the majority of the documents that are relevant to this action are located in the State of

Wisconsin. This includes all engineering documents prepared by a Wisconsin engineer, as well as all documents that have been submitted by the Defendants to the City and County of Milwaukee, and all documents issued from the City and County of Milwaukee. While the retrieval of these documents should not impose a substantial burden on either party to obtain, there is no doubt that it is more convenient for the parties if this matter were tried in Wisconsin.

Based upon the number of non-party witnesses that possess vital information and testimony in this action, it will be clearly more convenient for the parties to obtain these witnesses' testimony, and ultimately compel these witnesses appearance, if necessary, in the State of Wisconsin. Thus, this matter should be transferred to the Eastern District of Wisconsin.

### d.    The Plaintiff's Ability to Bear the Expense of Trial in Wisconsin is Much Greater than the Defendants' Abilities to Bear the Expense of Trial in Illinois

As stated earlier, not only will the Defendants' ability to compel the attendance of the non-party witnesses will be extremely difficult if this action is heard in Illinois, but the Defendants will also face extreme financial hardship of their own if forced to litigate this action in Illinois. These hardships include the costs of attempting to subpoena all non-party witnesses, the costs of travel for the non-party witnesses, as well as the costs that are simply associated with litigating a dispute outside of their home jurisdiction. Further, New Vision has only been in existence for approximately two years and does not possess any substantial assets. In contrast, the Plaintiff would not face such a burden if this matter were transferred to Wisconsin. Particularly, the Plaintiff has asserted that it is a "well known, national, and fully integrated full service real estate firm...[that] has completed more than 7,500 commercial real estate transactions valued in excess of $2 billion and generated on average in excess of 1,000 real estate transactions each year of its existence." (See Complaint ¶1) Further, the Plaintiff maintains an Office in Brown Deer, Wisconsin [located within the Eastern District of Wisconsin], and throughout the negotiations between the parties, the Plaintiff utilized the services of a Milwaukee law firm. Accordingly, it is clearly more convenient for this dispute to be litigated in the State of Wisconsin.

### 3.    The Transfer of this Matter to the Eastern District of Wisconsin Will Serve the Interests of Justice.

The final consideration under § 1404(a) is whether a change of venue would serve the interest of justice, focusing on the efficient administration of the court system rather than the interests of the parties themselves. *Espino v. top Draw Freight System, Inc.*, 713 F.Supp. 1243, 1245 (N.D.Ill. 1989) (citations omitted). The interests of justice include "such concerns as ensuring a speedy trial, trying related litigation together, and having a judge who is familiar with

the applicable law try the case." *Heller Financial, Inc. v. Midwhey Powder Co., Inc.* 883 F.2d at 1293 (citation omitted). In the present case, transferring this matter to the Eastern District of Wisconsin would serve in the interests of justice.

a.      **The Transfer of this Dispute to the Eastern District of Wisconsin Will Not Undermine the Court's Desire to Ensure the Parties Receive a Speedy Trial**

There are numerous court management statistics available for analysis; however, the two measurements that bear the most relevance to courts in analyzing a motion to transfer are: (1) the median number of months from filing to disposition of civil cases, and (2) the median number of months from issue to trial in civil cases. *Chemical Waste Management, Inc. v. Sims*, 870 F.Supp. 870, 875-878 (N.D.Ill. 1994) (citation omitted). In this regard, the Northern District of Illinois and the Eastern district of Wisconsin are extremely similar. In 2007, the districts were within two months of each other in the median number of months from filing to disposition in civil cases. (See U.S. District Court – Judicial Caseload Profile: Illinois Northern, Wisconsin Eastern, attached). Additionally, the most recent data compiling the median number of months from filing to trial has the districts within two months of each other. *Id.* Accordingly, the Plaintiff will not suffer any substantial delay in obtaining an efficient resolution to this matter if the case is transferred to the Eastern District of Wisconsin.

b.      **The Eastern District of Wisconsin is More Familiar with the Applicable Law in this Dispute**

In a diversity case, a federal court is to apply the choice of law provisions of the forum state. *Klaxton v. Stentor Electric Manufacturing*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In Illinois, courts apply the "most significant relationship" test of the Restatement (Second) of Conflicts of Law, incorporating a presumption that the law of the state where the injury occurred should apply. *Foster v. United States*, 768 F.2d 1278, 1280 (7th Cir. 1980); *Ingersoll v. Klein*, 46 Ill.2d 42, 45, 262 N.E.2d 593 (1970). However, courts have held that in fraud and misrepresentation cases, the location of the injury is a nebulous issue; specifically, "in cases of fraud or misrepresentation, unlike personal injury, the place of the loss is less important than the place the defendant allegedly made the misrepresentations." *See First National Bank of Boston v. Heuer*, 702 F.Supp. 173, 175 (N.D.Ill. 1988) (citations omitted). Thus, in order to determine which states laws apply, the court must first determine where the alleged misrepresentations took place.

The Plaintiff has alleged to this Court that is possessed an oral agreement with the Defendants that the Plaintiff would serve as the "lead equity partner" and developer of the

14

property located at Sixth and State Street in Milwaukee, Wisconsin. (See Complaint ¶6) However, the Plaintiff alleges that the Defendants altered, falsely represented, and misrepresented to Milwaukee County the documentation of the proposal for the option to purchase and develop the Site which listed the Defendant, New Vision, as the lead member of the development team, rather than the Plaintiff. (See Complaint ¶23) Accordingly, based upon the Plaintiff's own allegations, the Defendants allegedly made the misrepresentations that are the basis for their fraud and breach of fiduciary duty claims in the State of Wisconsin. Thus, because the alleged misrepresentations that form the basis of the Plaintiff's complaint occurred in the State of Wisconsin, Wisconsin law is applicable in this case.

      **c.**    **The Eastern District of Wisconsin Possesses a Strong Relation to This Dispute and has a Strong Desire to Resolve This Controversy as the Result of this Dispute Will Have a Direct Impact on Development in the City and County of Milwaukee**

There is a compelling interest for a Wisconsin court to hear this case. Specifically, the subject of this dispute is regarding the development of Wisconsin property located at Sixth and State Street in Milwaukee owned by County. The development requires City and County approval. Further, the case involves two defendants that are Wisconsin residents. These factors, combined with the private interest factors listed above, demonstrate that the interests of justice require this matter to be transferred to the Eastern District of Wisconsin.

## V.   CONCLUSION

This action was brought in federal court under diversity jurisdiction, which requires compliance with 28 U.S.C. § 1391(a) for choosing a proper venue. It is the Plaintiff's burden to establish that the chosen venue is proper. Further, it is only the actions of the Defendants, while located in the chosen venue, that determine whether there has been a substantial event with a close nexus to the cause of action, not the action of the Plaintiff. The venue that has been chosen by the Plaintiff is improper. Pursuant to FRCP 12(b)(3), this Complaint must be dismissed. Alternatively, should this Court find that venue is proper in this District, this case should be transferred to the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1404(a), as that forum is clearly more convenient.

                        Respectfully Submitted,
                        By: s/ Brian P. Mack
                        ARDC 6255657
                        bmack@macklawyers.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

HSA COMMERCIAL, INC. d/b/a
HSA COMMERCIAL REAL ESTATE,
an Illinois corporation,

       Plaintiff,

vs.

STEVEN STEWART AND NEW VISION
DEVELOPMENT CO., LLC a Wisconsin
limited liability company,

       Defendants.

Case No. 08-CV-1805

## **AFFIDAVIT OF STEVEN STEWART**

STATE OF WISCONSIN)
               )SS
MILWAUKEE COUNTY)

Steven Stewart being first duly sworn upon oath does hereby depose and state as follows:

1.     That I am a licensed Wisconsin real estate broker and I am in the business of locating, brokering, and providing commercial and residential real estate services in the State of Wisconsin.

2.     That I am the sole member of New Vision Development Co., LLC (hereinafter "New Vision") which was established as a Wisconsin limited liability company on May 17, 2006.

3.     That New Vision is in the business of developing real estate in southeastern Wisconsin.

4.      That in approximately 2005 I became aware of an opportunity to purchase property owned by the County of Milwaukee at 6th and State Street. This opportunity was brought to my attention by John Bowles. Mr. Bowles and others had developed a preliminary plan and some potential tenants for a mixed use development at the location of 6th and State and had submitted their proposal to the County of Milwaukee in an attempt to obtain the rights to purchase the property at 6th and State in approximately 2002. Although the attempt by Mr. Bowles' team to obtain the right to purchase this property was not successful at the time, he felt that the County would still be receptive to his ideas for the development of this piece of property.

5.      That I became actively involved in putting together a plan for the development of this property in 2005. It was my intent to use a similar mixed used development plan to the previous plan that had been presented by Mr. Bowles, which included the development of a parking lot, retails shops and MATC resource buildings at this site. Toward this end, I contacted several local companies including Voss Jorgenson and Schuler and CG Schmidt Construction Company to determine their level of interest in constructing and/or financing this development. Although I had several meetings with both companies regarding the development of this site, no agreements were ever reached because at this time the County had not yet presented a Request to the Public specifying that the Site was for sale.

6.      That on or about the Summer/Fall of 2007, I received a Request for Proposal or RFP from Milwaukee County asking that anyone interested in purchasing this property submit plans and information regarding their proposed development. The RFP had to be submitted to Milwaukee County by September 6, 2007.

7.      That on a previous business and real estate concern in Milwaukee, Wisconsin, not involving the Site at 6th and State Street, I ran into Eric Ogden, a Vice President with HSA

2

Commercial, Inc. We discussed various real estate projects that I was involved in located in the State of Wisconsin and I learned from Mr. Ogden that a HSA was in the business of providing financing for projects in the Milwaukee area, as well as actively participating in numerous real estate deals throughout the United States. Further, Mr. Ogden informed me that HSA had an office in Brown Deer, Wisconsin.

8.     That some of the first work I did with HSA involved negotiations for property located in Appleton, Wisconsin. That HSA was interested in possibly purchasing this property, and I represented HSA in regards to this possible purchase. That through these dealings, there were several meetings between myself, members of HSA, and representatives for the property owners, Brian Kliesmet and George Christiansen.

9.     That while working on another project located in the City and County of Milwaukee, at the corner of State and Van Buren, I met with representatives of HSA and George Schmidt from CG Schmidt Construction Company. That the project located on Van Buren consisted of a parcel that a former Edwardo's Pizzeria was located, and we were discussing the possibility of developing condominiums on that property. That the representatives from HSA at this meeting were John Mangel and Dan Miranda. That while at this meeting, I informed the representatives of HSA about the possible development of the Site at 6th and State, and myself, Mr. Schmidt, Mr. Mangel and Mr. Miranda all visited the Site to inspect the property.

10.    That subsequent to the original meeting at the Site, arrangements were made between HSA and I to meet with HSA to discuss the project that I was attempting to put together for the property at 6th and State.

11.    That on or about July 27, 2007 I traveled to HSA's Chicago office for a meeting with HSA regarding New Vision's potential development of the Site located at 6th and State

3

Street in Milwaukee. In addition to the HSA representatives present, this meeting was also attended by Mr. John Bowles, Mr. Rob Weich and Mr. Alex Carter. Mr. Weich and Mr. Carter are real estate brokers assisting with attempting to locate potential tenants for this development. In the meeting we discussed the following: The basic development plan that New Vision had been working on for the Site; that New Vision was in the process of building a team for the Development of the Site; that New Vision was the lead development firm for this Site; that New Vision had already begun to utilize Mr. Bowles as the Project and Development Manager; that New Vision was already utilizing the services of Mr. Carter and Mr. Weich in brokering potential leases for the Site; and that New Vision inquired whether HSA would be interested in becoming a part of the team being put together by New vision, since Mr. Mangel and Mr. Miranda had expressed initial interest while at the Site in Milwaukee. Additionally, New Vision informed HSA that their role on the team would primarily be through financing; however, since HSA has been involved in numerous real estate transactions throughout the country, New Vision was interested in any ideas that HSA might have for the development of the Site.

12.    That after this initial meeting with HSA, HSA representatives came to Milwaukee on at least four or five occasions to inspect the site and discuss the scope of this development project with me. During these meetings I made clear to HSA representatives that our need for HSA's services in this project would be in providing the financing through their investors and/or through other project financing needs. It was also my understanding that HSA had a relationship with CPS, a major parking structure operator and since our mixed use development plans included a parking structure, we knew that HSA's relationship with CPS would also assist us with developing an agreement with CPS once we got to that point in the project.

4

13.      That HSA expressed interest in working with New Vision on the project and we began discussions regarding the project and a potential agreement to follow.

14.      That on or about September 6, 2007 I submitted on behalf of New Vision a proposed development plan to the County of Milwaukee seeking to obtain the option to purchase the 6th and State Street property. This plan was submitted in response to a Request for Proposal ("RFP") that was sent out by the County. The proposed development plan is attached hereto as Exhibit A, and the RFP is attached as Exhibit B. The proposed development plan lists New Vision as the potential owner of the property and mentions other entities which New Vision would be working with to develop the property, including HSA. (See "Project Description" of Proposed Development Plan)

15.      That at the time I submitted this Proposed Development Plan, my discussions with HSA were preliminary and we had reached no agreements regarding the relationship between New Vision and HSA.

16.      That from the date I submitted this proposal on behalf of New Vision through the date Milwaukee County awarded New Vision the option to purchase the Site, HSA came to Milwaukee on numerous occasions and participated in the following:

A.      November 17, 2007 HSA, John Bowles and I met with President of MATC at MATC's offices located at 700 W. State Street in Milwaukee, Wisconsin, to discuss MATC's interest in leasing property at 6th and State;

B.      January 29, 2008 HSA traveled to Milwaukee and along with John Bowles and I, made a presentation to the Economic Development Committee of Milwaukee County at Milwaukee County's offices located at 901 N. 9th Street in Milwaukee, Wisconsin, regarding the Request for Proposal.

5

C.      HSA attended meetings with MATC in Milwaukee on approximately six occasion. I was present for approximately 3-4 of those meetings.

D.      On February 7, 2008 HSA and John Bowles attended a County Supervisor's meeting in Milwaukee regarding the status of the project.

17.     During this period of time while HSA and New Vision were working on this project, HSA and New Vision were exchanging various offers to define how the parties would be compensated from this project. Several offers were made by HSA to New Vision and offers likewise were made by New Vision to HSA regarding the parties' relationship. No agreement was ever reached and it became clear after HSA attempted to cut New Vision out of the development through participation in several meetings with MATC representatives that were scheduled without my knowledge, that HSA and New Vision would not be able to reach an agreement.

18.     As a result of the failure of the negotiations with HSA, I began looking for a new financing relationship with other entities. The search began subsequent to New Vision being awarded the option to purchase the Site from Milwaukee County.

19.     That during the entire period of time between my first contact with HSA regarding this project and the failure of the negotiations prior to and subsequent to the award of the option to purchase for New Vision, I only met with HSA twice in its Chicago offices. All other contacts with HSA occurred in Milwaukee on the Site of the proposed development or various meetings in the Milwaukee area with County officials, MATC representatives or additional individuals or entities involved in the potential development of the Site.

20.     That I am offering this Affidavit in support of Defendants' Motion for Change of Venue.

6

Dated this 2⁸ day of April, 2008.

Steven Stewart

Subscribed and sworn to before me this
2⁸ day of April, 2008.

Notary Public, State of Wisconsin
My Commission: ι⊃ Peᴿᴹᴬᴠᴇᴹ

L:\CMM\Stewart\HSA Commercial\Answer

6

## IV. PROJECT DESCRIPTION - Revised

### Project Description

The Building will include multiple uses on various floors. The Building's first floor will be designed for approximately 50,000 square feet of retail. We intend to attract a premier restaurant, with potentially a sports theme, to occupy the Building's northeast corner. The balance of the retail square footage will include a variety of users including additional convenience restaurants, a drug store, a coffee store, a bank and other retail users. Portions of the first floor will also accommodate the circulation of the parking garage and service the retail venues. The north side of the second through six floors is expected to be used by an institution for academic purposes. The institution we are in discussions with is empowered to enter into a long-term lease for these facilities without having to receive authorization from an outside authority. The south portion of floors two through six is planned for 600 parking spaces to service a variety of local users including Bradley Center attendees and people conducting business at the City and County Court Systems. The parking garage will be operated by Central Parking Services. Above the parking garage, HSA plans on developing two seven-floor, towers. The first tower, to be developed on the north end, will incorporate apartments for 450 residents. The target market for these residents is Milwaukee Area Technical College students. The second tower will be developed at a later point in time as a second phase. The use for this second tower is currently undetermined, but may include additional residences, office or academic uses. The enclosed roof of the parking structure, not cover by the first tower, will be "greened" to act as a roof-top terrace for the residents of the tower.

New Vision Development in association with HSA Commercial Real Estate, Kahler Slater Architects, and Central Parking Systems are confident that we can deliver a project that will contribute significantly to the people of the County of Milwaukee.

### Financing Approach

HSA's strong financial position allows our team investment-banking options that have worked on successful transactions utilizing a wide variety of approaches on projects similar to this one. The firm's internal balance sheet and ability to attract competitive external private investment resources is a major advantage.

New Vision Development and HSA are prepared to secure the equity and debt for this transaction. HSA has received significant interest from financial institutions to provide the construction financing on this project and will complete these discussions after site control is obtained.

We have developed the attached Financial Analysis in an effort to support the Public Benefits this project will provide. Furthermore, it is our intent to maximize the opportunity for the development to be included on the property tax roles (or an equivalent annual flow of revenue) for the long-term economic benefit local governmental entities are requesting.



EXHIBIT

A

## PROJECT DESCRIPTION - Revised

Design Exhibits
The Design Exhibits follow:

## V. SITE PLAN - Revised

**Site Plan**

The Site Plan is included in the Design Exhibits. Sheet SK 002 gives the content and the relationship to surrounding environment.

## VI. PROJECT SCHEDULE - Revised

Project Schedule

Following approval of the option by the County, planning and preliminary design will take approximately four months. We would anticipate participating in the municipal approval cycle starting in January 2008. We anticipate a six-month review and approval cycle with the City. Concurrent with the design activities will be the development of the financing package awaiting final placement and City of Milwaukee approvals. The land purchase and development closing is scheduled for November 1, 2008. We anticipate an eighteen month construction process.

A bar chart schedule follows describing the detail of the schedule.

## VII. PROJECT VALUATION - Revised

**Estimated Project Valuation - Revision**

Based upon the current project program all phases, including improvements, land and development costs are projected at $75,000,000. The total valuation of the parking structure element is approximately $18,000,000 and the total valuation of the retail/institutional user tower is approximately $57,000,000.

The project scope and development costs are subject to the feasibility of the project elements.

### DBE Goals & Commitment

The Development Team is committed to attaining the required Disadvantaged Business Enterprise participation goal of 25% for construction and 17% for professional services associated with the project. The Team has solicited the assistance of the National Association of Minority Contractors – WI Chapter to exceed the proposed goals. Our collective experience with achieving project goals for Minority and Disadvantaged Business Contracts is unmatched in the Milwaukee Marketplace. We will competitively bid and negotiate contracting opportunities with the primary responsibility of meeting the project goals. Currently, our project Team includes CMR Project Development as a principle development partner with New Visions Development. DBE firms have and will provide resources in our development, planning and professional services as first tier contractors

Segmenting the current project budgets our plan is to provide Disadvantaged Business Enterprise opportunities in the following areas:

Professional Services – Architectural/Engineering & Construction Management     $9,000,000

      Targeted DBE Opportunities of approx. $2,500,000 include:

      Environmental Engineering and Associated Services
      Civil Engineering
      Structural Engineering
      Mechanical Engineering
      Subcontracted Architectural Reimbursable
      Project Management and Planning

Construction Services and Supplies – At Risk Value     $61,000,000

      Targeted DBE Opportunities of approx. $20,000,000 include:

      Project General Conditions
      Site Management and Security
      Grading and Excavation
      Site and Structural Concrete

Precast Concrete
Structural Steel
Masonry
Carpentry
Drywall and related surfaces
Painting
Tile and Floor finishes
HVAC
Plumbing and Fire Protection
Electrical and Communications
And all material purchases associated with the project.

Upon approval of the project delivery method, final development scheme and final budget we
will provide a detail plan to exceed the project goals.

# CIVIC CENTER MULTI-USE COMPLEX

## Financial Analysis - Public Benefits

| Component | Classrooms | Dorms | Parking | Retail | Total | Notes |
|---|---|---|---|---|---|---|
| Square Feet | 105,000 | 225,000 | 225,000 | 50,000 | 605,000 | |
| Units | | 450 | 600 | | | |
| Cost PSF | $ 150 | $ 150 | $ 80 | $ 150 | | |
| Total Construction Cost | $ 15,750,000 | $ 33,750,000 | $ 18,000,000 | $ 7,500,000 | $ 75,000,000 | Construction 1 per  $ 250,000 |
| Construction Employment | 63 | 135 | 72 | 30 | 300 | |
| Full Time Employment | 12 | 7 | 12 | 100 | 131 | |
| Property Tax Rate | 0.0% | 2.5% | 2.5% | 2.5% | | |
| Estimated Property Tax | $ - | $ 843,750 | $ 450,000 | $ 187,500 | $ 1,481,250 | |
| Retail Sales PSF | | | | $ 300 | $ 300 | |
| Total Sales | | | $ 1,365,329 | $ 15,000,000 | $ 16,365,329 | |
| Sales Tax Rate | | | 5.6% | 5.6% | 5.6% | |
| Total Sales Tax | | | $ 76,458 | 840,000 | 916,458 | |
| Total Taxes | $ - | $ 843,750 | $ 526,458 | $ 1,027,500 | $ 2,397,708 | |
| Full Time Job Creation | 75 | 142 | 84 | 130 | 431 | |
| Intangible Benefits | *Better learning environment | *Attract better students | *Increase traffic to area | *Area lacks retail | | |

## IV. PROJECT DESCRIPTION - Revised

### Project Description

The Building will include multiple uses on various floors. The Building's first floor will be designed for approximately 50,000 square feet of retail. We intend to attract a premier restaurant, with potentially a sports theme, to occupy the Building's northeast corner. The balance of the retail square footage will include a variety of users including additional convenience restaurants, a drug store, a coffee store, a bank and other retail users. Portions of the first floor will also accommodate the circulation of the parking garage and service the retail venues. The north side of the second through six floors is expected to be used by an institution for academic purposes. The institution we are in discussions with is empowered to enter into a long-term lease for these facilities without having to receive authorization from an outside authority. The south portion of floors two through six is planned for 600 parking spaces to service a variety of local users including Bradley Center attendees and people conducting business at the City and County Court Systems. The parking garage will be operated by Central Parking Services. Above the parking garage, HSA plans on developing two seven-floor, towers. The first tower, to be developed on the north end, will incorporate apartments for 450 residents. The target market for these residents is Milwaukee Area Technical College students. The second tower will be developed at a later point in time as a second phase. The use for this second tower is currently undetermined, but may include additional residences, office or academic uses. The enclosed roof of the parking structure, not cover by the first tower, will be "greened" to act as a roof-top terrace for the residents of the tower.

New Vision Development in association with HSA Commercial Real Estate, Kahler Slater Architects, and Central Parking Systems are confident that we can deliver a project that will contribute significantly to the people of the County of Milwaukee.

### Financing Approach

HSA's strong financial position allows our team investment-banking options that have worked on successful transactions utilizing a wide variety of approaches on projects similar to this one. The firm's internal balance sheet and ability to attract competitive external private investment resources is a major advantage.

New Vision Development and HSA are prepared to secure the equity and debt for this transaction. HSA has received significant interest from financial institutions to provide the construction financing on this project and will complete these discussions after site control is obtained.

We have developed the attached Financial Analysis in an effort to support the Public Benefits this project will provide. Furthermore, it is our intent to maximize the opportunity for the development to be included on the property tax roles (or an equivalent annual flow of revenue) for the long-term economic benefit local governmental entities are requesting.

## PROJECT DESCRIPTION - Revised

Design Exhibits
The Design Exhibits follow:

## V. SITE PLAN - Revised

**Site Plan**

The Site Plan is included in the Design Exhibits. Sheet SK 002 gives the content and the relationship to surrounding environment.

## VI. PROJECT SCHEDULE - Revised

Project Schedule

Following approval of the option by the County, planning and preliminary design will take approximately four months. We would anticipate participating in the municipal approval cycle starting in January 2008. We anticipate a six-month review and approval cycle with the City. Concurrent with the design activities will be the development of the financing package awaiting final placement and City of Milwaukee approvals. The land purchase and development closing is scheduled for November 1, 2008. We anticipate an eighteen month construction process.

A bar chart schedule follows describing the detail of the schedule.

**VII. PROJECT VALUATION - Revised**

**Estimated Project Valuation - Revision**

Based upon the current project program all phases, including improvements, land and development costs are projected at $75,000,000. The total valuation of the parking structure element is approximately $18,000,000 and the total valuation of the retail/institutional user tower is approximately $57,000,000.

The project scope and development costs are subject to the feasibility of the project elements.

**DBE Goals & Commitment**

The Development Team is committed to attaining the required Disadvantaged Business Enterprise participation goal of 25% for construction and 17% for professional services associated with the project. The Team has solicited the assistance of the National Association of Minority Contractors -- WI Chapter to exceed the proposed goals. Our collective experience with achieving project goals for Minority and Disadvantaged Business Contracts is unmatched in the Milwaukee Marketplace. We will competitively bid and negotiate contracting opportunities with the primary responsibility of meeting the project goals. Currently, our project Team includes CMR Project Development as a principle development partner with New Visions Development. DBE firms have and will provide resources in our development, planning and professional services as first tier contractors

Segmenting the current project budgets our plan is to provide Disadvantaged Business Enterprise opportunities in the following areas:

Professional Services – Architectural/Engineering & Construction Management    $9,000,000

      Targeted DBE Opportunities of approx. $2,500,000 include:

      Environmental Engineering and Associated Services
      Civil Engineering
      Structural Engineering
      Mechanical Engineering
      Subcontracted Architectural Reimbursable
      Project Management and Planning

Construction Services and Supplies – At Risk Value    $61,000,000

      Targeted DBE Opportunities of approx. $20,000,000 include:

      Project General Conditions
      Site Management and Security
      Grading and Excavation
      Site and Structural Concrete

Precast Concrete
Structural Steel
Masonry
Carpentry
Drywall and related surfaces
Painting
Tile and Floor finishes
HVAC
Plumbing and Fire Protection
Electrical and Communications
And all material purchases associated with the project.

Upon approval of the project delivery method, final development scheme and final budget we will provide a detail plan to exceed the project goals.

$+1/-2$

OFFICIAL NOTICE NO. 6273

# *REQUEST FOR PROPOSALS*

*Milwaukee County is soliciting proposals for the purchase and development of a vacant 1.894 acre County-owned property in the City of Milwaukee.  Milwaukee County is seeking a developer or development team ("Proposer") to purchase and develop the property in a manner that is compatible with and compliments the surrounding area and contributes to the tax base of the City of Milwaukee and Milwaukee County.*

## SUMMARY

*Property Location:*    Prime frontage on West State Street, North Sixth Street, West Kilbourn Avenue (Civic Center on/off ramp to I-43) and North Seventh Street.  The subject property comprises one city block in the western downtown business district and is in close proximity to the Midwest Airlines Convention Center, the Bradley Center and the Milwaukee Area Technical College Campus (**Exhibit A**).

*Property Size:*    1.894 +/- acres with approximate dimensions of 271.48'on West State Street, 305.17'on North Sixth Street, 271.50' on West Kilbourn Avenue and 302.63'on North Seventh Street (survey attached as **Exhibit B**).

*Property History:*    The subject property, formerly known as the UW-Milwaukee Civic Center Campus located at 929 North 6th Street, previously comprised two multi-story office/conference buildings used by the UW-Extension Service.  The State of Wisconsin conveyed the property to Milwaukee County in 1998.  Milwaukee County demolished the two buildings and constructed an interim asphalt parking lot on the property.  Existing parking on the property is authorized by means of a special use permit granted by the City of Milwaukee.

*Asking Price:*    $3,100,000

**No brokerage fee will be paid by Milwaukee County.**

*Zoning:*    The subject property is zoned Central Business District: Civic Activity C9D (A).  Office, Retail, Hotel and Residential uses are all permitted under the zoning and consistent with Milwaukee's Downtown Plan.  Retail uses are limited to primarily serve residents, employees in the district and patrons of activities in the area.  The district is divided into two sub-districts.  Sub-district A, in which the subject property is located, accommodates medium-sized buildings with some setbacks.

*Potential Use:*    Mixed-use commercial/office development, with parking accommodations that serves the proposed development and possible area parking needs.  Area parking demand should be considered in sizing the parking component of the development for the subject site.  Parking as a principal use is strongly discouraged and any parking structure should consider first floor retail as a component of the development.  A use that maximizes street level pedestrian activity is encouraged.

1



OFFICIAL NOTICE NO. 6273

- The subject property provides for multiple buildings. Buildings shall have a minimum height of four (4) stories at all of the required setback lines along street frontages.
- Building massing should reinforce all street walls and be compatible with surrounding buildings.
- Street frontages not occupied by buildings should be enlivened at the pedestrian scale and shall have street edge elements, such as masonry walls, architectural fencing and formal landscaping.
- Building(s) should be oriented so that primary facades face toward all surrounding streets.
- Building facades should be composed to clearly articulate the base, middle and top of multi-story composition.
- Transparent glass that allows maximum visibility into and out of buildings is required at the ground level.
- Major signs identifying the building and its tenants should be designed as an integral part of the architecture and façade composition.
- Blank, unarticulated walls facing streets are not permitted.
- Architectural landmark lighting of the building is encouraged.
- Building entrances should be significant architectural elements. Ground floor retail uses should have individual entrances.
- Parking shall be located underground, within buildings, or in interior courtyards. Surface parking as a principal use is prohibited.
- All curb cuts and service drives shall be designed to minimize disruption to the pedestrian realm.
- Above ground parking facilities within buildings must conceal sloping floors from street view.
- All service bays and loading areas must be enclosed within the building, and not visible from the street.

*Utilities:*    Municipal sewer and water are available to the subject property. It is the responsibility of the Proposer to verify with the City of Milwaukee the location and capacity of the utilities necessary to serve the proposed development. The existence and/or suitability of laterals are the responsibility and obligation of the Proposer. Deferred assessments on the subject property, if any, shall be the financial obligation of the Proposer.

*Environmental Conditions:*    An independent Phase I & II Environmental Site Assessment (ESA) was conducted on the subject property. The ESA recommended no further action on the property at this time since the majority of the property is covered with an asphalt parking lot. However, disturbance of the subsoil may require special handling and disposal. A portion of the ESA is attached as **Exhibit C**. A complete copy of the ESA is available for review.

*Subsoil Conditions:*    An independent preliminary geotechnical subsurface exploration was performed on the subject property. The geotechnical report indicates that bedrock was encountered at depths ranging from 69 to 99 feet below existing grade. Miscellaneous fill, concrete, brick, traces of foundry sand and other construction-type rubble were encountered. A portion of the geotechnical report is attached as **Exhibit D**. A copy of the complete report is available for review.

*Subsoil*
*Conditions:*
*(continued)*

The subject property formerly contained two buildings (see **Exhibit B** attached). Therefore, the property may contain foundations, building materials, and/or various debris from the previous demolition. The Proposer is responsible for and must make adequate allowance for all excavation and disposal costs necessary for their particular project proposal. Other than the geotechnical report cited above, Milwaukee County has no information regarding the bearing capacity of the soil and the Proposer accepts the property in "as-is" condition. After the selection of a proposal, a right of entry permit will be made available from Milwaukee County, upon request, to conduct subsoil investigations at the Proposer's expense.

*Storm water*
*Management*
*Plan:*

For any property that exceeds one acre, the Proposer will be required to submit a storm water management plan prepared by a registered engineer, in conformance with Chapter 120, City of Milwaukee Code of Ordinances. See www.mkedcd.org/build/pdfs/stormwat.pdf for more information.

*Conveyance*
*Restriction:*

Conveyance of the property shall be "as-is" without warranty as to soil, subsoil and environmental conditions. Proposer shall be responsible for all property development costs, including, but not limited to, extension of water and sewer laterals to the property line, vacation charges or fees, if any, deferred assessments, if any, and the replacement of sidewalks and curb cuts. Sale of the property will be subject to the Proposer commencing construction of the proposed development within three (3) months of the closing date and completing the construction pursuant to the development schedule approved by Milwaukee County. In the event the Proposer fails to comply with the project commencement date, Milwaukee County shall have the option to repurchase the property and the Proposer agrees to reconvey the property by warranty deed, free and clear of all liens, encumbrances, taxes, assessments and rights of others, except those in existence, if any, prior to the conveyance of the property to the Proposer. **This condition shall be incorporated in the deed conveying the property and shall be binding on successor owners, heirs and/or assigns of the Grantee.**

*DBE utilization*
*Plan:*

The Proposer will be required to comply with the "Disadvantaged Business Enterprise (DBE)" participation goal of 25% of the project's construction budget and 17% for the project's professional services non-construction budget. Documentation by the Proposer to satisfy or exceed this utilization percentage must be made to the Community Business Development Partners (CBDP) office of Milwaukee County prior to closing. For more information please contact the County CBDP office at 414-278-5248.

*Development*
*Agreement:*

Proposer will be required to enter into a Development Agreement, as part of the Property closing that includes but is not limited to, the content, commitments/obligations and schedule of the approved development project by Milwaukee County and the City of Milwaukee, and the DBE utilization plan. See the sample Development Agreement attached as **Exhibit E.**

*Performance*
*Deposit:*    The Proposer shall submit to Milwaukee County, at or prior to closing, a
Performance Deposit ("Deposit") or Bond in the amount of the $50,000.00 and in a
form satisfactory to Milwaukee County. The Deposit/Bond shall serve as security
for the satisfactory performance of the obligations and commitments outlined in the
Proposer's proposal approved by the Milwaukee County Board of Supervisors and
County Executive, this Request for Proposals, the Development Agreement and as a
guarantee for the completion of the development approved by the City of
Milwaukee. No interest will be paid on the Deposit/Bond.

*Proposal*
*Deadline:*    Proposals must be received by **4:00 PM on September 6, 2007** in the office of the
Milwaukee County Clerk.

*Approval/*
*Grant of Option:*    Upon approval of a Proposer and a proposed development by the Milwaukee
County of Supervisors and the County Executive, the Proposer will be granted a
nonassignable nine (9) month option to purchase on the Wisconsin Department of
Regulation and Licensing form WB-24 (**Exhibit F**). The option period shall be
used by the Proposer to satisfy any and all purchase and development requirements
of the City and /or other regulatory agencies. The Proposer shall exercise the option
on or before the expiration of the nine-month option period and close the purchase
within thirty (30) days thereafter. A three (3) month option extension will be
provided for in the option. The selected Proposer shall pay a $60,000.00 option fee
in the form of a certified cashier's check or money order for the nine-month option
period and an additional $30,000 option fee shall be paid for the three-month option
extension period. The $60,000 option fee, and $30,000 option extension fee (if
applicable), shall be credited against the purchase price at closing, but not refunded
if the property purchase is not finalized.

*Property Closing:*    Closing the sale is contingent upon the completion to the satisfaction of Milwaukee
County of the following items:
- Approval of the project design and construction plans by the City of
  Milwaukee. Said plans shall be consistent with the proposal approved by
  the Milwaukee County Board of Supervisors and County Executive.
- Project financing satisfactory to Milwaukee County.
- Permit to commence construction issued by the City of Milwaukee.
- Approved and signed Development Agreement between the Proposer
  and Milwaukee County.

## PROPOSAL CONDITIONS/REQUIREMENTS/INSTRUCTIONS

**The proposal submitted under this Request for Proposals shall include, but not necessarily be
limited to the following:**

*Qualifications:*    Identify the corporate identity, ownership type, individuals and/or development
team submitting the proposal and summarize the expertise, background and
experience they possess to complete the proposed development. Describe any
comparable development projects completed by the individuals and/or development
team.

OFFICIAL NOTICE NO. 6273

*Purchase price:*    The price being offered for the subject property.

*Project Description:*    A project narrative indicating the type and/or mix of the development being proposed, the compatibility of the proposed development with the immediate neighborhood and how the development will enhance the neighborhood. The proposal should outline the financing strategy and demonstrate project feasibility, along with budget and project income expectations (including estimated rents, unit sales prices, etc). The proposal should include sketches, building elevations, preliminary/conceptual architectural plans, type of construction and building materials to be used. Describe any unique design elements or other features that make the proposal a signature or landmark development.

Colored three-dimensional renderings are recommended to support the project description.

*Site Plan:*    Preliminary plan(s) depicting building areas, open/green spaces, parking, pedestrian and automobile circulation, site ingress/egress, site landscaping and street-scaping.

*Project schedule:*    Estimated timeline/schedule of the proposed development, including commencement and completion dates. The project schedule should consider the design approval by the City of Milwaukee.

*DBE Utilization:*    Each proposal shall outline the Proposer's percentage participation goal of their project's construction budget and the professional services non-construction budget. As part of the preparing a proposal, the Proposer shall discuss with each Disadvantaged Business Enterprise their role in the project and what percent participation of construction or professional service they will provide, including estimated compensation for their services.

*Estimated Project Valuation:*    Estimated project cost, both hard cost and soft cost, (including developer's fees, if any) and estimated value of the project at completion, in year 2007-dollar amounts.

**It is strongly recommended that the submitted proposal include a table of contents and categorizes, tabs, and indexes the above stated items (and any additional items added by the Proposer) in an orderly manner for easy referencing and evaluating by those who will be reviewing the proposal.**

## PROPOSAL SUBMITTAL/CHANGES/CONTACT INFO/INFORMATIONAL MEETING

*Submission:*    Please send or deliver fifteen (15) copies of your proposal marked **Official Notice No. 6273** by the **4:00 PM September 6, 2007** deadline to:

Milwaukee County Clerk
Milwaukee County Courthouse
901 North 9th Street, Room 105
Milwaukee, WI 53233

**Proposals received after the date and time stated above will be returned unopened.**

OFFICIAL NOTICE NO. 6273

*Changes and*
*Clarifications:*    Any changes or clarifications to this Request for Proposals will be posted on the Request for Proposals website at:

www.milwaukee.gov/rfp6thandstate

*Pre-Submittal*
*Informational*
*Meeting:*    A Pre-Submittal Informational Meeting will be held on **Wednesday, July 25, 2007,** from 1:30 to 2:30 PM in Building B, County Health Related Programs (CHRP) Auditorium, 9501 West Watertown Plank Road, Wauwatosa, Wisconsin. Parties interested in submitting a proposal are encouraged to attend this meeting. Representatives from Milwaukee County and the City of Milwaukee will be present to answer questions. A summary of the questions and answers from this session will be posted thereafter to the www.milwaukee.gov/rfp6thandstate

Questions regarding this Request for Proposals or the Pre-Submittal Informational Meeting should be directed to Mr. Craig C. Dillmann, Manager of Real Estate Services, Milwaukee County at 414-278-4371 cdillmann@milwcnty.com .

Rejected proposals will not be returned. However, the option fee accompanying the rejected proposal(s) will be refunded.

All proposals submitted are the property of Milwaukee County and will not be returned. Portions of a proposal that are deemed proprietary please mark items as such. Milwaukee County will honor confidentiality requests to the extent possible.

## PROPOSAL EVALUATION AND SELECTION

**Proposals will be evaluated based on the following criteria:**

- The aesthetic quality, design, mix and architectural compatibility of the proposed development, including the type and quality of building materials, the extent of landscaping and the extent to which the proposed development compliments and enhances the surrounding area.

- Compatibility of the proposed use with the adjacent land uses and consideration given to the area parking needs.

- The purchase price, estimated project value, estimated project cost (hard and soft), development schedule and projected tax base (A taxable development is the objective of this Request for Proposals).

- The capability (including financial) and experience of the Proposer to complete the proposed development.

- Feasibility of the project financing plan/package

- The extent to which the Proposer addresses the DBE utilization goals within the proposed development. .

- Clear, organized, and concise presentation of the proposed project (table of contents with tabbed sections in the proposal).

- Overall responsiveness to the requirements of the Request for Proposals.

After the proposal has been submitted, and received by Milwaukee County no changes shall be made to the proposal unless requested by Milwaukee County to clarify or amplify particular aspects of the proposal.

Milwaukee County reserves the right to accept or reject any or all proposals for any reason at its sole discretion; and/or to discuss/negotiate the terms and conditions of a submitted proposal with a Proposer or the selected Proposers; or to request additional information or documentation concerning a submitted proposal.

The content of this Request for Proposals is for informational purposes only and the representations made herein, though thought to be accurate, are without warranty. Proposers shall rely exclusively on their own investigations and analyses.

Pursuant to adopted County Board Ordinance 9.05(2)(1) no person(s) with a personal financial interest in the approval or denial of a contract (proposal) being considered by a County department or with an agency funded and regulated by a County department, may make a campaign contribution to any County official who has approval authority over that contract during its consideration. Contract consideration shall begin when a contract is submitted directly to a County department or to an agency until the contract has reached final disposition, including adoption, County Executive action, proceedings on veto (if necessary) or departmental approval. This provision does not apply to those items covered by Section 9.15 (honorariums, fees, and expenses) unless an acceptance by an elected official would conflict with this section.

## Estimated Witness List

**(1)      Steve Stewart, Mequon, Wisconsin resident**

Mr. Stewart is a named Defendant, and is also the sole member of the Defendant, New Vision Development Company, LLC. Mr. Stewart will provide testimony regarding every aspect of the Plaintiff's causes of action, including all dealings that both named Defendants have had in the potential development of the Site located at 6th and State Street in Milwaukee, Wisconsin.

**(2)      John Bowles, Brown Deer, Wisconsin resident**

Mr. Bowles has been familiar with the property located at 6th and State Street in Milwaukee since approximately 2002.    Mr. Bowles was a part of a development team that attempted to obtain the rights to purchase the Site, but was ultimately unsuccessful.    Mr. Bowles presented the idea of the potential development of this property to Mr. Stewart.   Mr. Bowles and Mr. Stewart worked together for New Vision Development Company in creating a development plan.    To this end, Mr. Bowles served as the Project and Development Manager for New Vision Development Company. In this role, Mr. Bowles was involved in many meetings and correspondence between the parties.

**(3)      Rob Weich, Wisconsin resident**

Mr. Weich is a Wisconsin licensed real estate broker.  Mr. Weich was present at the Plaintiff's office in Chicago were an initial meeting between the parties occurred and the potential development of the Site that is the subject of this dispute was discussed. Mr. Weich's role on the potential development of the Site has been in attempting to find and secure possible tenants for the Site.

**(4)      Alec Carter, Wisconsin resident**

Mr. Carter is a Wisconsin licensed real estate broker.  Mr. Carter was present at the Plaintiff's office in Chicago were an initial meeting between the parties occurred and the potential development of the Site that is the subject of this dispute was discussed. Mr. Carter's involvement on the development of the Site was to attempt to find and secure potential tenants for the development.

**(5)      David Schmidt, Wisconsin resident**

Mr. Schmidt works for CG Schmidt Construction Company.  Mr. Schmidt was present at a jobsite located in Milwaukee, Wisconsin, at the corner of State and Van Buren when Mr. Steve Stewart was there, as well as Mr. John Mangel and Mr. Dan Miranda [representatives for HSA]. While there, Mr. Schmidt was involved in discussions with Mr. Stewart and the representatives from HSA regarding the potential development of the property located at 6th and State Street

in Milwaukee. Additionally, Mr. Schmidt, Mr. Stewart, Mr. Mangel, and Mr. Miranda all traveled to the Site at 6th and State and viewed the property. Mr. Schmidt also had discussions with Mr. Stewart regarding the possible involvement of CG Schmidt on the construction and/or financing of the development at 6th and State.

**(6)    Morrie Andrade, Wisconsin resident**

Mr. Andrade is a registered lobbyist. Mr. Andrade helped Mr. Stewart and New Vision Development Company in obtaining necessary approvals and in scheduling meetings with members of the City and County of Milwaukee in preparation for the proposed development plan that was submitted to the County of Milwaukee by New Vision Development Company. In addition, Mr. Andrade also helped New Vision in the location of financing for the possible development of the Site

**(7)    Brett West, Wisconsin resident**

Mr. West is an engineer employed by Kahler Slater, Inc., a Milwaukee Architectural company. Kahler Slater was hired to perform engineering work on the proposed development plan for the property located at 6th and State. Mr. West was directly involved in providing these services, and participated in meetings and correspondence between the parties.

**(8)    Darnell Cole, Wisconsin resident**

Mr. Cole is the President of Milwaukee Area Technical College ("MATC"). Mr. Cole was involved in numerous meetings between the parties regarding the potential development plan that was submitted by New Vision Development Company. All meetings that were conducted with MATC and the parties occurred in Milwaukee, Wisconsin.

**(9)    Mike Sergeant, Wisconsin resident**

Mr. Sergeant is employed by MATC and is believed to be the head of finance. Mr. Sergeant was involved in numerous meetings between the parties regarding the potential development of the property located at 6th and State Street in Milwaukee. After several meetings, Mr. Sergeant became the point man for MATC on this potential development.

**(10)   Al Evinrude, Wisconsin resident**

Mr. Evinrude is employed by MATC as the Director of Construction Services. Mr. Evinrude participated in numerous meetings between the parties regarding the potential development of the property located at 6th and State in Milwaukee, Wisconsin.

**(11)    Bob Dennick, Wisconsin resident**

Mr. Dennick is employed by Milwaukee County as the Director of Economic and Community Development.  Mr. Dennick had several conversations with Mr. Stewart regarding the proposed development plan submitted to the County by New Vision Development Company, informing Mr. Stewart how the process took place, and what the City and County were looking for in a development plan.  It is also believed that Mr. Dennick was involved in meetings with Milwaukee County in which the County decided to send out a Request for Proposal for the development of the property, and ultimately, the awarding of the option to purchase the property to New Vision Development Company.

**(12)    Gerald Baker, Wisconsin resident**

Mr. Baker is employed by Milwaukee County and is the head of the real estate division.  Mr. Baker was directly involved in the County's Request for Proposal for the Site located at 6th and State in Milwaukee.  Further, it is believed that Mr. Baker was involved in reviewing the proposed development plan submitted by New Vision Development Company, and taking place in meetings in which Milwaukee County ultimately decided to award the option to purchase the Site to New Vision.

**(13)    Craig Dillman, Wisconsin resident**

Mr. Dillman is employed by Milwaukee County and serves as a manager in the real estate services department.  Mr. Dillman was involved in numerous aspects of the Request for Proposal for the Site, as well as the review and award of the option to purchase the Site to New Vision.  Mr. Dillman has had several conversations with the parties regarding the proposed development.

**(14)    Joe Rice, Wisconsin resident**

Mr. Rice is employed by the City of Milwaukee as the City Commissioner.  Mr. Rice participated in several conversations with Mr. Stewart regarding the proposed development of the Site, and provided advice to Mr. Stewart on how New Vision should approach the submission of its proposed development plan.

**(15)    Rocky Marcoux, Wisconsin resident**

Mr. Marcoux_ is employed by the City of Milwaukee and serves as City Commissioner.  Mr. Marcoux participated in several meetings with New Vision regarding the potential development of the Site, specifically regarding necessary changes to the current zoning of the property.  Additionally, Mr. Marcoux informed New Vision about the vision the City of Milwaukee has for the

McArthur Square Corridor [which the Site is located in] in order to help New Vision prepare its proposed development plan for the County.

**(16)   Bob Greenstreet, Wisconsin resident**

Mr. Greenstreet is an architect employed by the City of Milwaukee. Mr. Greenstreet participated in several meetings with New Vision to provide New Vision with guidance on the City's vision for the McArthur Square Corridor.

**(17)   Dan Casanova, Wisconsin resident**

Mr. Casanova is employed by the City of Milwaukee and participated in several meetings with New Vision to provide New Vision with guidance on the City's vision for the future of the McArthur Square Corridor.

**(18)   Brian Kliesmet, Wisconsin resident**

Mr. Kliesmet is employed in Milwaukee, Wisconsin and was involved in negotiations between Mr. Stewart and HSA on the property located in Appleton, Wisconsin. To this end, Mr. Kliesmet participated in several meetings attended by both Mr. Stewart and HSA.

**(19)   George Christianson, Wisconsin resident**

Mr. Christianson is employed in Milwaukee, Wisconsin and was involved in negotiations between Mr. Stewart and HSA on the property located in Appleton, Wisconsin. To this end, Mr. Christianson participated in several meetings attended by both Mr. Stewart and HSA.

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| WISCONSIN EASTERN | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | | |
| OVERALL CASELOAD STATISTICS | Filings* | | 1,665 | 1,740 | 1,744 | 1,906 | 1,639 | 1,658 | U.S. | Circuit |
| | Terminations | | 1,777 | 1,719 | 1,740 | 1,738 | 1,548 | 1,634 | | |
| | Pending | | 1,483 | 1,664 | 1,637 | 1,621 | 1,446 | 1,293 | | |
| | % Change in Total Filings | Over Last Year | | -4.3 | | | | | 61 | 4 |
| | | Over Earlier Years | | | -4.5 | -12.7 | 1.6 | .4 | 37 | 2 |
| | Number of Judgeships | | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | .0 | .0 | 7.5 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 333 | 347 | 349 | 381 | 328 | 332 | 71 | 7 |
| | | Civil | 246 | 279 | 279 | 310 | 265 | 269 | 66 | 7 |
| | | Criminal Felony | 67 | 56 | 54 | 56 | 46 | 48 | 51 | 4 |
| | | Supervised Release Hearings** | 20 | 12 | 16 | 15 | 17 | 15 | 56 | 4 |
| | Pending Cases | | 297 | 333 | 327 | 324 | 289 | 259 | 72 | 6 |
| | Weighted Filings** | | 387 | 423 | 397 | 437 | 363 | 387 | 57 | 5 |
| | Terminations | | 355 | 344 | 348 | 348 | 310 | 327 | 69 | 7 |
| | Trials Completed | | 6 | 8 | 11 | 7 | 9 | 8 | 94 | 7 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 8.8 | 8.9 | 9.5 | 8.1 | 7.8 | 7.1 | 52 | 3 |
| | | Civil** | 8.2 | 8.8 | 9.1 | 7.8 | 8.4 | 8.3 | 33 | 3 |
| | From Filing to Trial** (Civil Only) | | - | 28.0 | 20.3 | 22.0 | 18.0 | 15.0 | - | - |
| OTHER | Civil Cases Over 3 Years Old** | Number | 46 | 116 | 131 | 48 | 14 | 20 | | |
| | | Percentage | 4.1 | 8.6 | 9.6 | 3.5 | 1.1 | 1.8 | 40 | 4 |
| | Average Number of Felony Defendants Filed Per Case | | 1.8 | 1.7 | 1.6 | 1.5 | 1.4 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 52.75 | 41.45 | 38.52 | 41.23 | 38.56 | 41.93 | | |
| | | Percent Not Selected or Challenged | 42.9 | 33.7 | 28.9 | 27.5 | 28.8 | 28.2 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1231 | 79 | 26 | 328 | 46 | 5 | 137 | 144 | 54 | 57 | 199 | 3 | 153 |
| Criminal* | 330 | 4 | 106 | 19 | 85 | 56 | 7 | 20 | 3 | 2 | 5 | 11 | 12 |

* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not
** See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **ILLINOIS NORTHERN** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing |
| | | | | | | | | | U.S. | Circuit |

| | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|
| **OVERALL CASELOAD STATISTICS** | Filings* | 8,422 | 8,093 | 9,056 | 10,584 | 11,126 | 11,135 | | |
| | Terminations | 7,929 | 8,255 | 8,805 | 11,461 | 10,888 | 10,709 | | |
| | Pending | 8,091 | 7,711 | 7,914 | 7,706 | 8,699 | 8,587 | | |
| | % Change in Total Filings — Over Last Year | | 4.1 | | | | | 27 | 2 |
| | % Change in Total Filings — Over Earlier Years | | | -7.0 | -20.4 | -24.3 | -24.4 | 81 | 6 |
| | Number of Judgeships | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | Vacant Judgeship Months** | 15.8 | 5.7 | 12.0 | 9.6 | 22.1 | 17.8 | | |
| **ACTIONS PER JUDGESHIP** | FILINGS — Total | 382 | 367 | 412 | 481 | 505 | 506 | 62 | 4 |
| | FILINGS — Civil | 346 | 330 | 369 | 437 | 461 | 459 | 36 | 3 |
| | FILINGS — Criminal Felony | 24 | 26 | 34 | 32 | 38 | 39 | 93 | 7 |
| | FILINGS — Supervised Release Hearings** | 12 | 11 | 9 | 12 | 6 | 8 | 77 | 6 |
| | Pending Cases | 368 | 351 | 360 | 350 | 395 | 390 | 48 | 3 |
| | Weighted Filings** | 462 | 443 | 485 | 512 | 526 | 525 | 39 | 3 |
| | Terminations | 360 | 375 | 400 | 521 | 495 | 487 | 66 | 5 |
| | Trials Completed | 11 | 11 | 13 | 12 | 12 | 14 | 86 | 6 |
| **MEDIAN TIMES (months)** | From Filing to Disposition — Criminal Felony | 14.7 | 13.9 | 12.9 | 10.3 | 9.9 | 10.3 | 90 | 7 |
| | From Filing to Disposition — Civil** | 6.2 | 6.5 | 6.9 | 5.9 | 5.5 | 5.5 | 7 | 2 |
| | From Filing to Trial** (Civil Only) | 29.7 | 26.4 | 27.0 | 28.4 | 26.0 | 26.0 | 65 | 5 |
| **OTHER** | Civil Cases Over 3 Years Old** — Number | 456 | 500 | 388 | 337 | 442 | 461 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 6.5 | 7.4 | 5.6 | 5.0 | 5.6 | 6.0 | 65 | 6 |
| | Average Number of Felony Defendants Filed Per Case | 1.7 | 1.8 | 1.9 | 1.9 | 1.7 | 1.7 | | |
| | Jurors — Avg. Present for Jury Selection | 45.20 | 45.07 | 51.46 | 39.36 | 45.57 | 43.63 | | |
| | Jurors — Percent Not Selected or Challenged | 31.8 | 30.9 | 36.9 | 31.0 | 37.3 | 34.8 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7620 | 118 | 150 | 701 | 53 | 55 | 1504 | 902 | 563 | 428 | 1614 | 23 | 1509 |
| Criminal* | 527 | 1 | 152 | 59 | 43 | 107 | 80 | 13 | 6 | 17 | 11 | 11 | 27 |

* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
** See "Explanation of Selected Terms."